TEXAS EMPLOYERS INSURANCE ASSOCIATION, Appellant,

v.

Mrs. Wanda S. ADAMS et al., Appellees.

No. 7539.

Court of Civil Appeals of Texas.

Texarkana.

March 17, 1964.

Rehearing Denied July 21, 1964.

———◆———

Jerry V. Walker, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, John Camp, Bell, Camp, Gwin & Furse, Bay City, for appellant.

Raymond L. McDermott, Houston, Moise Simon, Bay City, John H. Jenkins, Mabel Grey Howell, Houston, for appellees.

FANNING, Justice.

The opinion of February 11, 1964 is withdrawn and the following opinion is rendered.

A workmen's compensation case. The jury found that the deceased employee was in the course of his employment at the time he received fatal injuries. Judgment was entered for appellees, the widow and minor children, and appellant insurer has appealed.

Appellant presents three points on appeal contending that there was no evidence and insufficient evidence that the deceased employee was in the course of his employment when he received fatal injuries and that such finding of the jury was also against the great weight and preponderance of the evidence.

For a comprehensive discussion of the law applicable to the determination of such character of points see Chief Justice Calvert's article, " 'No Evidence' and 'Insufficient Evidence' 'Points of Error' ", 38 Tex. Law Rev., No. 4, p. 361.

Roland Cole Adams was a working foreman for his employer, Chapin & Pruitt, Contractors, on Dec. 8, 1961, when he met his death in an automobile accident in Matagorda County, Texas. He had worked for his employer about seven years prior to his death. Chapin & Pruitt, Contractors, were telephone contractors and did repair work on contract basis and built new lines for telephone companies. Mr. Adams' permanent home was in Rosharon, Brazoria County, Texas. His work was of a transient nature throughout generally the South Texas area, and his wife and children would go with him from place to place. On Sept. 10, 1961, and prior to the devastating storm and hurricane known as "Hurricane Carla", Adams and his crew of workers were transferred to the Port Lavaca area where the job of his employer required Adams and his crew to work in a swampy area doing repair and maintenance work for a telephone company. Upon receiving notice of the storm warnings Adams and his crew left and later returned after the storm.

Adams and his crew were furnished by the employer with a 1948 Bell Ford utility truck which had been purchased second-hand from Bell Telephone Company which truck had a winch and an A-line, with a trailer, used for carrying and picking up telephone poles. This truck was kept at the job site except when it was needed to be brought to town for fuel or was needed to carry heavy telephone poles and cross-arms to the job site, because the crew had no other vehicle for this purpose. This truck was not in good condition and was "hard to

hold on the road." Ordinarily Adams and his crew had another pickup truck assigned to them by the employer, however, in August, 1961, in moving the crew's operations from Raymondville to Port Lavaca, this 1956 Ford pickup truck, which was then being driven by Mr. Pruitt, was wrecked.

Sometime later, during Hurricane Carla or two or three days after the storm, a second-hand 1952 or 1954 Chevrolet panel (telephone type) truck was purchased by the employer for the use of Adams and his crew. There was testimony that this truck was "wore out", that the transmission on it was frozen about one week prior to Mr. Adams' death and to the effect that the truck then was unusable.

There was testimony to the effect that after the old Chevrolet truck of the employer broke down and could not be used because of the frozen transmission, that Mr. Adams, with the knowledge, direction, consent and acquiescence of Mr. Pruitt, one of the partners, began using his own personal automobile for company business and for the particular purpose of transporting the crew. There was also testimony to the effect that a battery and fuel pump, as well as gasoline, was purchased for Adams' personal car on the Chapin & Pruitt Humble credit card, which automobile of Adams was being used by Adams on company business in lieu of the disabled Chevrolet truck for the purpose of transporting the work crew of his employer.

One of the specific duties required by the employer of its employee foreman Adams was for him to transport the work crew. The employer had previously furnished Mr. Adams a vehicle for this purpose and Mr. Adams had been using the old Chevrolet panel truck of his employer for this purpose until it became disabled. Adams' employer had a credit card with Humble and for several years Mr. Adams had been furnished by his employer with a Chapin & Pruitt credit card, and such a card was found among Adams' effects at the time of his death. There was also testimony to the

effect that Mr. Adams also received $50.00 in cash from Mr. Pruitt as expense money to keep the trucks in operation, and when this money was used up Mr. Adams would turn in the cash tickets and get another $50.00 from Mr. Pruitt.

On the day prior to Adams' death he and his crew were working near Green Lake in the swamps and near the town of Tivoli. They were getting the poles across the water any way they could and it was wet and muddy where they were working.

Dechert's Humble station at Port Lavaca was established as the meeting place for the crew to meet to be carried back and forth from Port Lavaca to the job site.

Mr. Pruitt admitted that it was Mr. Adams' duty to take the crew to and from work in some sort of transportation each day. He also testified to the effect that Mr. Adams went backwards and forwards in the Chevrolet truck from Port Lavaca to Blessing, Texas, where Adams and his family had temporary living quarters, and he admitted that he knew that Mr. Adams was using the Chevrolet company truck to go to Blessing. There was testimony to the effect that Mr. Adams took the company pickup and company panel truck the biggest part of the time while staying in temporary quarters in connection with the work of his employer, so his wife could have their personal car. Mr. Pruitt admitted that he never told Mr. Adams he could not take the company panel truck furnished to him to any of his temporary residences.

Mrs. Adams, widow of the deceased, also testified to the effect, among other things, that after the company's truck became unusable, that Mr. Pruitt told her husband to use his personal car (a '56 Chevrolet) to transport the crew, and that Mr. Pruitt said that the expenses for the operation of Mr. Adams' personal car would be paid for by the company.

Thus it seems clear from evidence of probative force in the record, that prior to and at the time of the death of Mr. Adams,

that there was no usable company truck of Chapin & Pruitt to transport Adams and his crew on the necessary company business, and that by the direction of Mr. Pruitt, the personal car of Mr. Adams was being used in lieu of or in substitution for a company car, and that various expenses for operation of Mr. Adams' car were being paid for and were paid for by Chapin & Pruitt. There was testimony to the effect that the company panel truck's transmission was frozen up where it could not be moved or driven about a week prior to Mr. Adams' death, and that during this week Mr. Adams used his personal car for the purpose of transporting himself and his crew to go out working from Port Lavaca towards Seadrift.

On the evening prior to Mr. Adams' death, Mr. Pruitt met with him in Port Lavaca and delivered pay checks to him for himself and crew and they discussed company business for some time, and such pay checks were among Mr. Adams' effects when he was killed. After leaving Mr. Pruitt, Mr. Adams proceeded in his automobile and was thereafter killed on the highway between Port Lavaca and Blessing that night. There was testimony of probative force from which it could be inferred that Mr. Adams' death occurred a short time after he left Mr. Pruitt.

If Mr. Adams had not have been killed and had lived it would have been his duty early the next morning to have proceeded in his personal automobile from his temporary quarters at Blessing to Dechert's filling station in Port Lavaca and there pick up his crew and transport them and himself in his personal automobile to the place where his crew was performing work for his employer. Because of his death and consequent failure to appear at Dechert's filling station in Port Lavaca the next morning the crew did not go to work because there was no transportation to get to and from their job as the employer had agreed to furnish.

There was also testimony to the effect that by reason of Hurricane Carla, Mr. Adams could not find temporary living quarters in the Port Lavaca area nearer than Blessing, Texas, and that Mr. Pruitt had let Mr. Adams off from work for him to try to find living quarters closer than Blessing, but none could be found.

Appellant, among other things, contends to the effect that since Adams was killed on the highway while on return to his residence quarters at Blessing, Texas, the appellees can not recover by reason of Art. 8309, Vernon's Ann.Civ.St., Section 1b. Sections 1 and 1b of Art. 8309, V.A.C.S., are discussed by the Supreme Court of Texas in the recent case of Jecker v. Western Alliance Insurance Company, Tex., 369 S.W.2d 776, and we quote from the court's opinion in said case in part in footnote 1 below.[1]

1. "Inasmuch as Jecker suffered his fatal injuries while traveling on a public highway, whether he was in the course of his employment at the time is measured and limited by Secs. 1 and 1b of Art. 8309, Vernon's Ann.Civ.St. Sec. 1, after eliminating injuries caused under certain circumstances, provides that the term 'injury sustained in the course of employment' shall 'include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere.' Sec. 1b, added in 1957, reads:

"'Unless transportation is furnished as a part of the contract of employment or is paid for by the employer, or unless the means of such transportation are under the control of the employer, or unless the employee is directed in his employment to proceed from one place to another place, such transportation shall not be the basis for a claim that an injury occurring during the course of such transportation is sustained in the course of employment. Travel by an employee in the furtherance of the affairs or business of his employer shall not be the

■ · It is our view that there is evidence of probative force in the record to the effect that there existed a contract either express- ly or impliedly for the employer to furnish

basis for a claim that an injury occurring during the course of such travel is sustained in the course of employment, if said travel is also in furtherance of personal or private affairs of the employee, unless the trip to the place of occurrence of said injury would have been made even had there been no personal or private affairs of the employee to be furthered by said trip, and unless said trip would not have been made had there been no affairs or business of the employer to be furthered by said trip.' "

"Special Issue No. 1 inquired whether Jecker was in the course of his employment at the time of his fatal accident. In connection with the special issue, the court gave an instruction defining 'in the course of his employment' in the language of Secs. 1 and 1b of Art. 8309 as that language relates to the facts in the case. The jury was instructed that 'in the course of his employment' meant 'originating in the work, business, trade or profession of Bay Chevrolet, Incorporated, and in the furtherance of its affairs of business.' The instruction then continued as follows:

" 'However, an employee, while travelling on the highway in an automobile, is not considered as being in the course of his employment unless the transportation is paid for by the employer or unless the employee is directed in his employment to proceed from one place to another place;' "

Finally, the instruction advised the jury that travel in furtherance of the business of the employer could not be the basis of a claim that the death occurred in the course of employment if the travel was also in furtherance of personal or private affairs, unless the trip would have been made had there been no personal or private affairs to be furthered and unless the trip would not have been made had there been no business of the employer to be furthered.

"The holdings of the Court of Civil Appeals that there is no evidence to support the jury's finding and that such finding is contrary to the weight and preponderance of the evidence, appears to be based upon an erroneous concept of applicable law and an erroneous construction of the trial court's instruction. The court, citing American General Ins. Co. v. Coleman, 157 Tex. 377, 303 S.W. 2d 370, 374, rested its conclusion on the general rule that an injury incurred in the use of public streets and highways *in going to and returning from the place of employment* is not a compensable injury because not incurred in the course of the employment as required by Sec. 1 of Art. 8309. There are exceptions to that general rule, also set out in Coleman, but the Court of Civil Appeals was of the opinion that the facts of this case did not bring it within any of the exceptions. It construed the exceptions as being limited to instances in which the employer furnishes transportation to the employee, or pays another to transport him, or directs him to perform a 'special mission' requiring travel on the streets or highways.

"The rule and the exceptions mentioned in Coleman should be interpreted in the factual context with which the Court was dealing. In that case the question to be decided was whether a workman whose employment had terminated and who was injured while traveling on a public highway in returning to the city in which he resided was injured in the course of his employment. In deciding the question, we applied the rule or test, and the exceptions, used to determine whether a workman who has completed his work for the day at his place of employment and is injured while traveling on the streets or highways in returning to his place of residence is injured in the course of his employment. The general rule is that he is not. The rationale of the rule is that injury incurred in such travel does not arise out of the employment. Texas General Indemnity Co. v. Bottom, Tex.Sup., 365 S.W.2d 350.

"The general rule is, in reality, even broader than we had occasion to state it in Coleman. It is that injuries incurred by a workman while traveling on public streets and highways are not incurred in the course of employment. But there are exceptions to that rule. One of the exceptions is when injury occurs while the workman is traveling on the public streets or highways pursuant to express or implied requirements of his employment contract. Smith v. Texas Employers' Ins. Ass'n, 129 Tex. 573, 105 S.W.2d 192; Safety Casualty Co. v. Wright, 138 Tex. 492, 160 S.W.2d 238; Jones v. Texas Indemnity Co., Tex. Civ.App., 223 S.W.2d 286, writ refused; Federal Underwriters Exchange v. Lehers, 132 Tex. 140, 120 S.W.2d 791.

Mr. Adams transportation to and from his temporary residence quarters at Blessing to the job site (and to transport his work crew to and from the job site) in a pickup truck or a panel truck furnished to him for that purpose with expenses for such transportation paid for by the employer, and further that when such company vehicle became unusable when the transmission was frozen up, that thereafter Chapin & Pruitt, the employer, directed and authorized Mr. Adams to use his own personal automobile for such purpose and for the purpose of also transporting the crew to and from their work. In order for Mr. Adams to fulfill his required duty of transporting his crew as well as himself to and from the job site of his employer, it was

As a matter of fact, we recognized this exception in Coleman by our quotation from Associated Indemnity Co. [Corp.] v. Bush, 5th Cir., 201 F.2d 843. The rationale of it is that since the workman's employment requires him to subject himself to the risks and hazards of streets and highways, his injuries grow out of his employment. Smith v. Texas Employers' Ins. Ass'n, supra. The exception was well established before the adoption of Sec. 1b of Art. 8309 by the Legislature, and it must be assumed that the section was enacted with full knowledge of it.

"Was the exception abolished by Sec. 1b of Art. 8309? We think not. We have recently recognized in Texas General Indemnity Co. v. Bottom, Tex.Sup., 365 S.W.2d 350, 353, that the Legislature intended by the enactment of Sec. 1b 'to circumscribe the probative effect that might be given to the means of transporation of the purpose of the journey rather than to enlarge the definition [of "injury sustained in the course of employment"] found in Section 1.' But the Legislature surely did not intend to provide that an employee whose employment requires him to travel at his own expense in his own automobile on streets and highways, either constantly or intermittently, should be denied compensation if accidentally injured while thus exposed to risks growing out of his employment. Any such holding would be wholly unjust to salesmen, servicemen, repairmen, deliverymen, and a host of others who may be required to use their own automobiles in their work, and would be a strict rather than a liberal interpretation of the Workman's Compensation Act.

"It is to be noted that one of the exceptions to the provision in Sec. 1b that 'transportation shall not be the basis for a claim that an injury occurring during the course of such transportation is sustained in the course of employment' is when 'the employee is directed in his employment to proceed from one place to another.' We construe this exception to include those situations in which the employee proceeds from one place to another under the terms of an employment which expressly or impliedly requires that he do so to discharge the duties of his employment. Having thus construed the statute, we give the same meaning to that part of the trial court's instruction which advised the jury that 'an employee, while travelling on the highway in an automobile, is not considered as being in the course of his employment * * * unless the employee is directed in his employment to proceed from one place to another place.'

"Our determination of whether there is in the record evidence of probative force that Jecker was in the course of his employment at the time of his fatal accident is made under governing law as announced above. There is evidence that he was in the course of his employment if there is evidence that (1) he was traveling on the highway pursuant to express or implied provisions of his employment contract that he do so in performance of his duties, and (2) that he would have made the trip had there been no personal or private affairs to be furthered and would not have made it had there been no business of his employer to be furthered.

*    *    *    *    *

"Under governing law as announced herein, we hold that there is in the record evidence of probative force supporting the jury's finding that Jecker was in the course of his employment when he was injured. There is no claim that he turned aside from the shortest route on the return trip to Palacios to serve some purpose of his own.

"It becomes unnecessary for us to decide whether payment by an employer for gasoline used by a workman in going from his place of residence to his place of work to begin his work day and in returning to his residence at the end of the working day is transportation 'paid for by the employer' within the meaning of Sec. 1b, Art. 8309 and the Court's instruction in this case."

incumbent upon him to take care of and to have ready the only means of transportation available to him and authorized by his employer to attend to the vital company business of transporting himself and his crew to and from the job in the devastated area occasioned by the usual conditions created by Hurricane Carla. Furthermore, it is our view that there is evidence of probative force in the record that the employer in directing Adams to use his personal automobile for the purposes above related in lieu of the disabled company vehicle, agreed to pay and did pay gasoline expenses and certain other auto expense of Adams' private automobile for such above stated purposes. It is our further conclusion that there is evidence of probative force in the record to support the view that Adams was being furnished transportation "paid for by the employer" within the meaning of Sec. 1b, Art. 8309, V.A.C.S., at the time of his death.

While we have not found any case directly or near in point with the unusual fact situation in the case at bar, it is our best judgment that there is evidence of probative force in the record to support the finding of the jury to the effect that Mr. Adams, the deceased employee, was in the course of his employment at the time he received his fatal injuries. In this connection see the following authorities: Jecker v. Western Alliance Insurance Company, supra, 369 S.W.2d 776; Federal Surety Co. v. Ragle, Tex.Com.App., 40 S.W.2d 63; Maryland Casualty Company v. Smithson, Tex. Civ.App., 341 S.W.2d 951, wr. ref., n. r. e.; Fritzmeier v. Texas Employers Ins. Ass'n, 131 Tex. 165, 114 S.W.2d 236; Texas Employers Ins. Ass'n v. Inge et al., 146 Tex. 347, 208 S.W.2d 867; Jones v. Casualty Reciprocal Exchange, Tex.Civ.App., 250 S. W. 1073, wr. ref.

We quote from the Ragle case, supra, 40 S.W.2d 63, in part as follows:

"* * * Our Supreme Court has announced the sound and humane rule

that the Workmen's Compensation Act is a 'remedial statute which should be liberally construed with a view to accomplish its purpose and to promote justice.'

"When we keep in mind that the lease where Ragle and the men worked was at a place where no arrangements for their accommodation has been made, situated six miles from the place where they resided; that an automobile was the only practical means of getting to and from the work; that it was parked on or near the premises where the men worked; that Ragle, during the hours of his employment, undertook to crank the automobile for the purpose of furnishing the men at work a means of transportation in which to ride home and was injured—these facts bring the case clearly within the rule announced by our Supreme Court in the Behnken Case [Lumberman's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S.W. 72, 28 A.L.R. 1402], supra, and it is therefore compensable under the provisions of the Workmen's Compensation Act."

We further hold that the evidence is sufficient to support the jury's finding that the deceased employee was in the course of his employment at the time he received his fatal injuries.

After carefully considering the entire record in this cause in the light of the rules announced in the case of In Re: King's Estate, 150 Tex. 662, 244 S.W.2d 660, is our further view that the jury's finding that the deceased employee was in the course of his employment at the time he received his fatal injuries is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

Appellant's points are overruled.

The judgment of the trial court is affirmed.

## ON MOTION FOR RE-HEARING

In addition to the authorities hereinbefore cited with reference to the question of "no evidence" we cite the recent decision of the Supreme Court of Texas rendered July 8, 1964, in Janak v. Texas Employers Insurance Association, Texas Supreme Court, 381 S.W.2d 176. While we have found no case near in point with the facts in the case at bar it is our best judgment that the Janak case, supra, the Jecker case, 369 S.W.2d 776, and other cases referred to in our main opinion on the question of "no evidence", tend to support our view that there was evidence of probative force in the record to support the finding of the jury to the effect that the deceased employee, Mr. Adams, was in the course of his employment at the time he received fatal injuries.

We adhere to all of our rulings in the main opinion and to our affirmance of the judgment of the trial court. Appellant's motion for re-hearing is in all respects overruled.